David S. Bloch (SBN 184530)
blochd@gtlaw.com
GREENBERG TRAURIG, LLP
Four Embarcadero Center, Suite 3000
San Francisco, California 94111
Telephone: 415.655.1300
Facsimile: 415.520.5609

*Attorneys for Defendant*
*Leica Microsystems Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF MICHIGAN<br><br>          Plaintiff,<br><br>v.<br><br>LEICA MICROSYSTEMS INC.,<br><br>          Defendant. | Case No. 5:19-cv-007470-LHK-VKD<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM [Civ. L.R. 7-2]**<br><br>Date:   May 21, 2020<br>Time:   1:30 P.M.<br>Place:  San Jose Courthouse,<br>          Courtroom 8 – 4th Floor,<br>          280 South 1st Street,<br>          San Jose, CA 95113 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF THE ISSUES TO BE DECIDED ............................................3

III.    FACTUAL BACKGROUND .................................................................................3

        A.      The '169 Patent .........................................................................................3

        B.      The Prosecution History of the '169 Patent ..............................................7

        C.      The Complaint and the Materials Incorporated Therein ..........................11

        D.      Leica's SP8 Microscopes ........................................................................12

IV.     LEGAL STANDARDS .......................................................................................14

        A.      Motion to Dismiss for Failure to State a Claim ......................................14

        B.      Patent Infringement .................................................................................17

                1.      Direct Infringement .....................................................................17

                2.      Indirect and Willful Infringement ...............................................17

V.      ARGUMENT ......................................................................................................18

        A.      The Complaint, Its Attachments, and Materials Incorporated Therein Show
                that There Is No Plausible Claim for Direct Infringement .........................18

        B.      There Can Be No Infringement Under the Doctrine of Equivalents
                as a Matter of Law ...................................................................................21

        C.      There Can be No Indirect or Willful Infringement...................................23

        D.      This Action Should be Dismissed With Prejudice....................................23

VI.     CONCLUSION....................................................................................................23

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                              **Page(s)**

3

*Amgen Inc. v. Coherus Biosciences Inc.*,
4
      931 F.3d 1154 (Fed. Cir. 2019)............................................................................................14

5
*Ashcroft v. Iqbal*,
      556 U.S. 662 (2009)............................................................................................................13
6

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
7
      512 F.3d 1338 (Fed. Cir. 2008)............................................................................................17

8
*Bell Atl. Corp. v. Twombly*,
      550 U.S. 544 (2007)............................................................................................................13
9

10
*Brown v. Elec. Arts, Inc.*,
      724 F.3d 1235 (9th Cir. 2013) .............................................................................................15
11

*Conoco, Inc. v. Energy & Envtl. Int'l L.C.*,
12
      460 F.3d 1349 (Fed. Cir. 2006)......................................................................................16, 21

13
*Cross Med Prods. v. Medtronic Sofamor Danek, Inc.*,
      424 F.3d 1293 (Fed. Cir. 2005)......................................................................................15, 17
14

15
*Cumberland Pharms. Inc. v. Innopharma, Inc.*,
      No. 1:12-cv-00618-LPS, 2013 WL 5945794 (D. Del. Nov. 1, 2013) ...........................................13
16

17
*Daniels-Hall v. Nat'l Educ. Ass'n*,
      629 F.3d 992 (9th Cir. 2010) ...............................................................................................15

18
*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
      363 F.3d 1263 (Fed. Cir. 2004)......................................................................................16, 22
19

20
*ecoNeugenics, Inc. v. Bioenergy Life Science, Inc.*,
      No. 17-cv-5378, 2018 WL 4210198 (D. Minn. Sept. 4, 2018)......................................................13
21

*EMD Millipore Corp. v. AllPure Techs., Inc.*,
22
      768 F.3d 1196 (Fed. Cir. 2014)............................................................................................20

23
*Fayer v. Vaughn*,
      649 F.3d 1061 (9th Cir. 2011) .............................................................................................13
24

25
*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
      535 U.S. 722 (2002)............................................................................................................20

26
*Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
27
      389 F.3d 1370 (Fed. Cir. 2004).............................................................................................15

28

*Howard v. Ford Motor Co.*,
    No. 1:16CV127-LG-RHW, 2016 WL 4077260 (S.D. Miss. Jul. 29, 2016) ...................... 13

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ........................................................................... 15, 17

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ................................................................................... 14

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ................................................................................. 13

*Ottah v. BMW*,
    230 F. Supp. 3d 192 (S.D.N.Y. 2017) ..................................................................... 14

*Ottah v. Fiat Chrysler*,
    884 F.3d 1135 (Fed. Cir. 2018) ............................................................................... 14

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017) ................................................................................. 19

*SEMICAPS Pte Ltd. v. Hamamatsu Corp.*,
    393 F. Supp. 3d 802 (N.D. Cal. 2019) .................................................................... 14

*Spectrum Pharm., Inc. v. Sandoz Inc.*,
    802 F.3d 1326 (Fed. Cir. 2015) ............................................................................... 16

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    635 Fed. App'x 891 (Fed. Cir. 2015) ................................................................. 16, 22

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
    728 F.3d 1309 (Fed. Cir. 2013) ............................................................................... 16

*U.S. Rubber Recycling, Inc. v. ECORE Int'l*,
    No. CV0909516SJOOPX, 2011 WL 13043495 (C.D. Cal. Aug. 8, 2011) .................... 14

*Uniloc USA, Inc. v. Apple Inc.*,
    No. C 18-00359 WHA, 2018 WL 2047553 (N.D. Cal. May 2, 2018) .......................... 13

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ................................................................................... 15

*Weissuch v. County of Los Angeles*,
    119 F.3d 778 (9th Cir. 1997) ............................................................................. 13, 22

*Wi-Lan, Inc. v. Apple Inc.*,
    811 F.3d 455 (Fed. Cir. 2016) ................................................................................. 16

**Other Authorities**

Fed. R. Civ. P. 8 ............................................................................................................... 13

Fed. R. Civ. P. 10(c) ......................................................................................................... 14

Fed. R. Civ. P. 12(b)(6) ................................................................................................ *passim*

Fed. R. Evid. 201 .............................................................................................................. 14

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 21, 2020, at 1:30 p.m., or at such time as the matter may be heard in the Courtroom of the Honorable Lucy Koh, located at Courtroom 8 – 4th Floor 280 South 1st Street, San Jose, CA 95113, defendant Leica Microsystems Inc. ("Leica") will and hereby does move to dismiss this case.

Leica asks the Court to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted because the infringement allegations are not facially plausible.

This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, Declarations, and supporting documents, on such matters as may be judicially noticed, on any oral argument the Court may hear, and on such other and further information as the Court may consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Leica moves under Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint for failure to state a claim on which relief can be granted. The Court should find the allegations of patent infringement implausible based on only the Complaint and its attachments, materials incorporated by reference into the Complaint, and the judicially-noticeable prosecution history of the asserted patent. Based on these materials, it is appropriate to resolve this case at this early stage. For the reasons explained in detail below, Leica requests that the Court grant this motion and dismiss this case with prejudice.

## I.    INTRODUCTION

Plaintiff The Regents of the University of Michigan ("U of M") filed a patent infringement suit against Leica, alleging that Leica's SP8 confocal microscopes infringe U of M's U.S. Patent No. 7,277,169 ("the '169 Patent") (ECF 1-1). This patent infringement case is about microscopes that are used to detect fluorescence of substances in samples after the fluorescent molecules in the sample absorb light of one wavelength ("an excitation wavelength") and emit light of another wavelength ("a fluorescence wavelength"). The claims of the '169 Patent are, in relevant part, directed to a very specific way of exciting fluorescent materials called "fluorophores." The '169 Patent claims all require several things that are missing from Leica's accused SP8 microscopes. And U of M knows this.

This motion should come as no surprise to the U of M because—as the Complaint itself admits (ECF 1 ¶¶ 22, 47, 49-52)—between 2016 and 2017, U of M spent roughly two years trying to convince Leica that Leica needed to take a license to the '169 Patent. During this time, Leica explained in detail why U of M was wrong when it asserted that Leica needed a license. Among other things, Leica's accused confocal microscopes do not implement the technology claimed in this patent. The culmination of these discussions came on Valentine's Day 2018, when Leica once again wrote to U of M to explain why its microscopes did not infringe the '169 Patent. Leica thought that U of M finally saw the light because Leica received no response from U of M on the matter until it was sued roughly twenty-two months later.

One of the reasons that Leica's accused microscopes do not infringe, either literally or under the doctrine of equivalents, is so blatant that it warrants dismissal for failure to state a claim. Claim 1 of the '169 Patent (the only patent claim asserted in the Complaint) requires, among other things: (1) a single-source white light generation system that outputs "a supercontinuum white light pulse comprising an entire spectrum of white light," and (2) exciting a "plurality of fluorophores of the sample to emit fluorescence" with "said supercontinuum white light pulse." '169 Pat., 7:46-50. The other independent claims all include indistinguishable limitations. *Id.*, 8:22-31 (cl. 10), 9:1-8 (cl. 19). The Complaint and the materials incorporated into the Complaint show that even if the accused Leica microscopes generated a white light pulse that comprised the "entire spectrum of white light" (which they do not), the white light generated in the Leica microscopes is *not* used to excite fluorophores. Instead, just as recognized by the Complaint, the user of the accused SP8 microscopes *tunes* the excitation wavelength. ECF 1 ¶ 32. The materials incorporated into the Complaint, such as a YouTube video heavily relied upon by U of M, show just what this means: a user can select up to eight discrete excitation lines – none of which are independently or collectively the "entire spectrum of white light – to be used to excite fluorophores. Declaration of Andrew Sommer ("Sommer Decl.") ¶ 2, Ex. A (YouTube video); *see* Request for Judicial Notice, filed herewith. Based on this, the accused Leica microscopes cannot plausibly literally infringe.

Nor can the accused Leica microscopes infringe under the doctrine of equivalents. To overcome claim rejections during the prosecution of the '169 Patent, the applicants had to distinguish

2

prior art references that excited fluorophores with multiple discrete excitation lines.  The applicants told the Patent Office that "the present invention does not limit the frequency of the excitation source within the white light spectrum . . . . The present invention uses the entire continuous spectrum of the white light simultaneously as a unique excitation source."  Sommer Dec. ¶ 4, Ex. C (Amendment) at 11; *see* Request for Judicial Notice.  The applicants stressed that the use of the "entire continuous spectrum" was "clearly different" from the use of discrete excitation lines shown in the prior art and had "sharply different" consequences, including avoiding the use of filters.  *Id.* at 12.  The prosecution history could not be more clear that the use of discrete excitation wavelengths to excite fluorophores was different than what U of M was trying to patent.  Because Leica's technology implements a system that uses discrete excitation lines as an excitation source and such systems were distinguished during prosecution, U of M cannot now recapture those systems within the scope of the claims, either literally or under the doctrine of equivalents.

Finally, without a plausible claim for direct infringement, U of M's claims of indirect and willful infringement cannot stand either.  Those too should be dismissed for failure to state a claim.  And because its allegations of infringement are implausible rather than just deficient, U of M has pled itself out of Court, and this case should be dismissed with prejudice.

## II.   STATEMENT OF THE ISSUES TO BE DECIDED

Whether the Complaint, coupled with the materials incorporated therein and the judicially-noticeable prosecution history, show that Plaintiff's claim for infringement is implausible on its face, thus warranting dismissal of the Complaint under Fed. R. Civ. P. 12(b)(6).

## III.   FACTUAL BACKGROUND

### A.   The '169 Patent

The '169 Patent is titled "Whole Spectrum Fluorescence Detection with Ultrafast White Light Excitation."  '169 Pat. at cover.  It was filed on February 16, 2006 and issued on October 2, 2007.  Researchers can study microscopic chemical and biological structures by measuring fluorescence of a sample after the sample is illuminated with light.  '169 Pat., 1:32-51; ECF 1, ¶ 17.  While some naturally-occurring substances fluoresce when light of a specific wavelength is directed on the

samples,[1] it is common to apply fluorescent dyes or markers to samples.  '169 Pat., 1:57-60, 6:2-5; ECF 1 ¶ 15.  The substances that fluoresce are called "fluorophores" in the '169 Patent.  When photons of light of a specific wavelength are directed onto a fluorophore, the fluorophore can absorb the photons and enter an "excited" state.  ECF 1 ¶¶ 15-16.  The light incident upon the fluorophore that causes it to enter the excited state is called "excitation light" in the '169 Patent.  *See* '169 Pat., 2:7-35.  As a matter of physics, fluorophores in an excited state want to return to their relaxed state and give off the energy that they just absorbed.  When they do so, the fluorophore emits a photon of another specific wavelength.  '169 Pat., 2:9-12.  "[F]luorescence emission occurs at a longer wavelength [than the excitation light] due to the Stokes shift when certain molecules have absorbed excitation photons of shorter wavelengths."  *Id.*  And, "both absorption and emission are unique characteristics of a particular molecule."  *Id.*, 2:20-22.  Techniques for studying the fluorescence of samples include "fluorescence microscopy," and "flow cytometry."  *Id.*, 1:54-57, 5:65-6:20, 7:23-40.

Because absorption and emission wavelengths are unique characteristics of a particular molecule, '169 Pat., 2:20-22, "with a single excitation wavelength, such as a laser source, only a limited number of fluorophores that have absorption matched with the excitation wavelength can be excited and thus detected."  *Id.*, 2:22-25.  According to the '169 Patent, the use of specific excitation wavelengths has "limited the selection of detectable fluorescent markers."  *Id.*, 2:32-35.  The '169 Patent also describes—and then disparages—one way to "simultaneously detect a large variety of cells stained with different fluorescent markers," which entailed "increas[ing] the number of excitation sources and detection channels."  *Id.*, 6:2-5.  The "most sophisticated commercially available system" had "three lasers with wavelengths at 488 nm, 633 nm, and 407 nm."  *Id.*, 6:5-11.  This system includes "a complicated signal collection system" and was "expensive."  *Id.*, 6:11-17.  "In spite of the complexity, this expensive flow cytometer is ***not capable of exciting all fluorescent markers*** in the visible and near infrared region ***due to the limited available excitation wavelengths***."  *Id.*, 6:13-17

---

[1] This is true of many different substances such as human cells and petroleum products, to name just a few.  This fluorescence takes place very quickly and, for many fluorophores, is far too quick to be observed by the human eye.

(emphasis added).  "In practice, it is almost impossible to further increase the number of lasers for excitation due to the limited unit size and complicated optical configurations necessary."[2]  *Id.*, 6:17-20.  The same problem of "using multiple lasers for excitation and complicated detection systems" is described with respect to fluorescence microscopy using confocal microscopes.  *Id.*, 7:24-34.

To solve these problems, the '169 Patent describes a "whole spectrum fluorescence detection system 10" that "can be used for simultaneously detecting multiple fluorophores having various fluorescence frequencies using an ultrafast, supercontinuum, white light pulse 22 source system."  '169 Pat., 3:33-37.  This whole spectrum fluorescence detection system 10 includes two main parts: a "white light generation system 12 and a detection system 14."  *Id.*, 3:37-39.  Because this Motion focuses on the illumination of the sample with the claimed supercontinuum of white light, further discussion will focus on the white light generation system.

The white light generation system has two main components.  The first is a laser source 16, which produces a "high intensity light pulse."  '169 Pat., 3:40-43.  This high intensity pulse is directed to the second main component of the disclosed light generation system, a "nonlinear material member 18," which can take the form of a sapphire or a "photonic crystal fiber."  *Id.*, 3:41-43, 48-50.  Due to something called non-linear optical phenomena (the specification refers to this as the "Kerr effect"), as the light passes through the non-linear optical material, it causes what was once a single wavelength laser light to take on many wavelengths, thus generating what the '169 Patent calls a "wide spectrum of light frequencies," and this can range "from visible to near infrared" and can even include "the ultraviolet region."  *Id.*, 3:55-56, 4:67-5:4.  The specification calls the wide spectrum light a "supercontinuum, white light pulse."  *Id.*, 3:33-37.

"[O]nce ultrafast white light pulse 22 is directed at sample 24, excitation of fluorophores contained in sample 24 cause such fluorophores to emit a fluorescence."  '169 Pat., 4:8-11.  "[D]ue to the wide spectrum of frequencies [i.e., wavelengths] contained within ultrafast white light pulse 22, a plurality of fluorophores, each emitting fluorescence in response to excitation at a particular frequency,

---

[2] As explained below, Leica came up with an innovative way to solve this problem that is materially different than the alleged invention of the '169 Patent.

1    can simultaneously be excited by virtue of the present teachings." *Id.*, 4:15-20.  The '169 Patent further

2    explains the purported benefits of this alleged invention to flow cytometry, stating: "employing the

3    principles of the present teachings, a single laser source can provide the necessary excitation of

4    different fluorescent biomarkers in the whole visible and near infrared region."  *Id.*, 6:21-24; *see also*

5    *id.*, 6:58-67 (touting the benefits of "whole spectrum detection system" or "white light generation

6    system").    Similar purported benefits are described with respect to applications in fluorescence

7    microscopy.  *Id.*, 7:35-40 (explaining that the use of a "single excitation source" allowed the system

8    "to provide a true whole spectrum fluorescence microscopy with a simple optical configuration by

9    using white light generation system 12 for excitation").

10            Every one of the independent claims of the '169 Patent includes limitations directed to the use

11    of a "wide spectrum" light source as an excitation source for fluorophores.  For example, independent

12    claim 1 requires:

13                a   single-source   white   light   generation   system   outputting   a

14                supercontinuum white light pulse comprising an entire spectrum of white

15                light, ***said supercontinuum white light pulse exciting the plurality of***

16                ***fluorophores*** of the sample to emit fluorescence

17

18    '169 Pat., 7:46-50 (emphasis added).  Independent claim 10 includes a similar requirement:

19                a single laser source outputting a laser pulse having a first time duration;

20                a member having a non-linear refractive index, said member receiving

21                said laser pulse therethrough and outputting a supercontinuum white

22                light pulse comprising an entire spectrum of white light, . . . ***said***

23                ***supercontinuum white light pulse exciting the plurality of fluorophores***

24                of the sample to emit fluorescence

25

26    *Id.*, 8:22-31 (emphasis added).  Finally, independent claim 19 similarly recites:

27

28

> a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, . . . ***said supercontinuum white light pulse exciting the first fluorophore and the second fluorophore*** to emit a first fluorescence and a second fluorescence

*Id.*, 9:1-8 (emphasis added).

All independent claims therefore require a "supercontinuum white light pulse comprising an entire spectrum of white light" and the excitation of fluorophores with "said supercontinuum white light pulse." The import of this claim language is clear: the fluorophores are excited using the entire spectrum of white light that is included as part of the "supercontinuum white light pulse." The prosecution history leaves no doubt that this is the plain meaning of the claim language.

**B.    The Prosecution History of the '169 Patent**

To overcome claims rejections and to secure allowance of the claims of the '169 Patent during prosecution, the applicants distinguished two prior art systems that illuminated fluorophores with discrete laser lines. *See* Sommer Decl., ¶¶ 3-4, Ex. B (Office Action), Ex. C (Amendment).

The first system, described in U.S. Patent Application Publication No. 2003/0058440 to Scott et al. ("Scott") is illustrated below. *Id.*, Ex. B (Office Action) at 6 (Scott, Fig. 1 as reproduced in the Office Action, with color annotations added).



---

Scott was used to reject the claims based on anticipation.  *Id.*, Ex. B (Office Action) at 2.  As can be seen here, different color laser beams are combined by a prism system and then incident upon the sample to excite fluorophores in the sample.  The examiner explained that Scott teaches a white light generation system:

> using multiple lasers emitting specific wavelengths of light, which are matched for efficient excitation of a give set of fluorophores . . . four excitation lines are combined (receiving said laser pulse) by inverse dispersion, which is illustrated but not limited to using a prism assembly or diffraction grating (non-linear refractive index).  The resultant beam would look on average light a "white light" laser beam (outputting white light pulse).

*Id.*

The examiner also rejected the claims as being obvious over U.S. Patent Application Publication 2003/0117618 to Itoh et al. ("Itoh") in view of a patent to Fernandez.  *Id.* at 7.  The examiner explained that Itoh taught:

> [b]y a system according to the invention, continuous spectrum white light pulses (white light generation system outputting a white light pulse) generated by converting ultra-short optical pulses (white light pulses having a first time duration) . . . a plurality of objective wavelength components are separately selected . . . . combined by dispersing element 25 into a composite optical pulse containing the objective wavelength components (white light pulse having a first frequency range). . . The composite optical pulse (white light pulse) is irradiated onto the bio-sample 28 and other samples (exciting the at least one fluorophore of the sample to emit a fluorescence) . . . .

8

*Id.*  The examiner then reproduced Itoh's Figure 1, which shows that a supercontinuum white light pulse is generated and certain components of the white light are reflected by a component (27a or 27b) back into the system and used to illuminate the sample (28).  *Id.* at 8.  This figure from the Office Action is reproduced below, with color added to show the continuum light generated and how certain components of the light pass through the element (27a) and others are reflected (as indicated by the arrows in Itoh's Fig. 1).



The applicants amended the claims and responded to the Office Action.  Sommer Decl., ¶ 4, Ex. C (Amendment).  First, the applicants amended each claim to require that the white light pulse of the claims needed to be a "supercontinuum" white light pulse and that it must "comprise an entire spectrum of white light."  *Id.* at 2, 4, 6.  To distinguish the multi-laser beam system of Scott, et al., the applicants contended that Scott "is fundamentally different from that claimed in the present application."  *Id.* at 8.  "In contrast" to Scott, "the present invention employs and claims a 'single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light . . . exciting the plurality of fluorophores of the sample to emit fluorescence' (Claim 1; similarly recited in claim 10)."  *Id.* at 9.  The applicants further distinguished Scott on the basis that:

> ***not all the fluorophores can be excited***; that is, ***only those having absorption matched with the excitation laser lines can be excited***.

1  
2  
3  
4  

> Instead, using the supercontinuum white light of the present invention as
>
> the excitation source, all the wavelengths are included in the continuous
>
> spectrum and every fluorophore becomes excitable.

*Id.* (emphasis added).  This, the applicants contended, "is the solution to the detection limitations of Scott et al. rather than similar thereto."  *Id.*; *see also id.* at 13 (making a similar argument as to an obviousness rejection of claim 19 based on Scott).

The applicants also sought to distinguish their claims from Itoh.  Specifically, they contended that:

> Itoh et al. teaches **selecting several discrete wavelengths** from a white
>
> light continuous spectrum and using those discrete wavelengths, ***not the***
>
> ***entire spectrum***, to excite only those fluorophores that have excitation
>
> spectra matched with the selected discrete wavelengths.  In contrast, ***the***
>
> ***present invention uses and claims the entire spectrum of the white light***
>
> ***to simultaneously excite all the fluorophores that have excitation***
>
> ***spectra covered by the entire white light spectrum***.

*Id.* at 10 (emphasis added). The applicants continued:

> the present invention does not limit the frequency of the excitation source
>
> within the white light spectrum, like conventional systems do by using
>
> filters or dispersing elements.  The present invention uses the entire
>
> continuous spectrum of white light simultaneously as a unique excitation
>
> source.   This is conceptually different from the conventional
>
> fluorescence detection method (including that of Itoh et al.) which use
>
> selected wavelengths as an excitation source.

Sommer Dec., ¶ 3, Ex. C (Amendment) at 11 (emphasis added).  The applicants further argued that:

the present invention differs in many ways compared to Itoh et al. and Fernandez et al., not the least of which is that the present invention employs the continuous spectrum of white light for excitation in addition to a time-resolving detector, whereas the prior art merely uses discrete portions of light spectrum to excite only selected fluorophores whose fluorescence is easily separated using frequency-domain based systems. These concepts are clearly different, and the consequences are sharply different. By using the entire continuous spectrum without filtering, one can simultaneously excite all of the fluorophores that have absorption within the spectrum. By using selected wavelengths, not all the wavelengths are converted and the fluorophores that can be excited are limited.

*Id.* at 12 (emphasis added).

The claims were then allowed. The applicants could not have been more clear that the use of discrete wavelengths as the excitation source is "clearly different" than using the claimed supercontinuum white light pulse itself as the excitation source—even if those discrete wavelengths are selected from the supercontinuum itself as in Itoh—and has "sharply different" consequences.

### C.    The Complaint and the Materials Incorporated Therein

U of M accuses Leica of infringing "at least claim 1 of the '169 Patent," ECF 1, ¶ 26, by using, offering for sale, distributing, sells, and/or importing "each and every model of Leica's SP8 confocal microscope family that employs a white light laser, including, for example, without limitation, the TCS SP8 X and TCS SP8 STED microscopes," *id.*, ¶¶ 25, 43. The alleged direct infringement is "literal[] or under the doctrine of equivalents." *Id.*, ¶ 25.

The Complaint quotes each limitation found in independent claim 1. *Id.*, ¶¶ 27, 29, 33. Then, the Complaint cites to certain advertisements, "product literature, including its promotional videos and

brochures," and websites to establish certain things about the accused Leica SP8 microscopes that allegedly show infringement. ECF 1, ¶¶ 27-28, 30-32, 34-39.

Of particular relevance to this Motion, the Complaint acknowledges that claim 1 of the '169 Patent recites: "a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, *said supercontinuum white light pulse exciting the plurality of fluorophores of the sample [to] emit fluorescence . . . .*" *Id.*, ¶ 29 (quoting '169 Pat., 7:46-50) (emphasis added). Merely parroting the claim language, the Complaint then alleges that "Leica advertises that its TCS SP STED, for example, has 'a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, said supercontinuum white light pulse exciting the plurality of fluorophores of the sample to emit fluorescence.'" ECF 1, ¶ 29.

The Complaint then alleges that the accused SP8 microscopes include a "White Light Laser" that "is a single device that produces a continuous spectral output between the wavelengths of 470 and 670 nanometers." *Id.*, ¶ 30 (quoting a YouTube video and a website). The Complaint quotes additional Leica materials as stating that "'[t]he white light laser source of the Leica TCS SP8 X perfectly matches the wavelength of any fluorophore.'" *Id.*, ¶ 31 (quoting a website). Finally, the Complaint alleges that Leica has stated that "'By **tuning** both **excitation** and detection, complete excitation emission spectrum can be acquired . . . .'" *Id.*, ¶ 32 (quoting website) (emphasis added). Thus, the Complaint alleges that the excitation wavelengths are tuned. This tunability is precisely why there can be no infringement, as discussed below.

In addition to accusing Leica of direct infringement, U of M alleges that Leica is indirectly infringing by inducing "customers and third parties who use the SP8 family of products" to infringe and by contributing to infringement of "at least claim 1," ECF 1, ¶¶ 40, 42. U of M further asserts that Leica has been a willful infringer of the '169 Patent. *Id.*, ¶¶ 46-52.

**D.   Leica's SP8 Microscopes**

We now describe the operation of certain features of the accused Leica SP8 microscopes based only on the materials U of M relied upon and identified in its Complaint. These facts are sufficient to show that infringement of the '169 Patent is utterly implausible.

12

The YouTube video relied upon by U of M shows that: "[t]he innovative Leica white light laser is a single device that produces a continuous spectral output between the wavelengths of 470 and 670 nanometers." Sommer Decl., ¶ 2, Ex. A (YouTube video) at 0:41-0:53. Importantly, the video then states that the Leica SP8 "***allows you to select eight excitation lines*** from 3 trillion unique combinations for simultaneous imaging of multiple fluorophores." *Id.* at 0:54-1:01. This is illustrated in the video as being the difference between having the colors of the rainbow (meant to depict light between 470 nm and 670 nm) and a couple of select lines like a red line and a yellow line.



**Ex. [[XX]] at 0:41-53**
**(showing "white light" source)**

***Id.* at 0:54-1:01**
**(showing individual excitation lines)**

The video also explains how the excitation wavelengths are winnowed down from the original broad-spectrum source. First, the video explains that "[t]he freedom to choose excitation wavelengths represents a challenge for fixed wavelength dichroic beam splitters." *Id.* at 1:10-1:16. The video then explains Leica's innovative solution for this problem: "Leica stands alone in solving the problem, doing so by way of our innovative acousto-optical beam splitter that automatically and instantaneously tunes up to eight excitation lines." *Id.* at 1:16-1:29. This is illustrated in the video as shown at right. As can be seen here, excitation light



enters the acousto-optical beam splitter and, as described in the video, up to eight discrete wavelengths of light emerge as "excitation lines." *Id.* The video then says that "[t]he Leica confocal with spectral detection, the acousto-optical beam splitter, and the white light laser is the only confocal that gives you

optimized imaging results by producing *finely tuned excitation* and emission detection *specific to every sample*." *Id.* at 1:40-1:57 (emphasis added). Another document, relied upon in paragraph 30 of the Complaint, indicates that the Leica TCS SP8 X has a "[t]uning range of 470 to 670 nm in 1 nm intervals."[3] Sommer Decl., ¶ 5, Ex. D (Brochure) at 1. Thus, this makes clear that, like the Itoh and Scott references, samples imaged using the accused SP microscopes are illuminated by as many as eight 1nm wide light sources—just like the discrete wavelengths that the applicants distinguished to get the '169 Patent in the first place.

## IV.   LEGAL STANDARDS

### A.   Motion to Dismiss for Failure to State a Claim

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In evaluating a motion under Rule 12(b)(6), a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But that does not oblige a court to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation omitted). Formulaic recitations of elements of a cause of action, without more, "falls short of alleging *factual* content sufficient to support" a claim. *Uniloc USA, Inc. v. Apple Inc.*, No. C 18-00359 WHA, 2018 WL 2047553, at *5 (N.D. Cal. May 2, 2018) (emphasis original); *see also Twombly*, 550 U.S. at 555.

"A plaintiff may plead [it]self out of court" if it "plead[s] facts which establish that [it] cannot prevail on [its] . . . claim." *Weissuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997)

---

[3] The user tunes the microscope on 1 nm increments, though the Acousto-optical beam splitter generates spectral lines that have a slight tolerance around the selected wavelength to produce the discrete excitation lines.

(quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).  This happens in patent cases just as it can happen in any civil case.  *See, e.g.*, *Cumberland Pharms. Inc. v. Innopharma, Inc.*, No. 1:12-cv-00618-LPS, 2013 WL 5945794, at *2-3 (D. Del. Nov. 1, 2013) (dismissing allegations of infringement because all claims covered formulations that were "free from a chelating agent," and based on allegations in complaint, accused products were not free from such an agent); *ecoNeugenics, Inc. v. Bioenergy Life Science, Inc.*, No. 17-cv-5378 (JNE/DTS), 2018 WL 4210198, at *8 (D. Minn. Sept. 4, 2018) (dismissing complaint because allegations in complaint showed accused product did not meet patent claims); *Howard v. Ford Motor Co.*, No. 1:16CV127-LG-RHW, 2016 WL 4077260, at *5 (S.D. Miss. Jul. 29, 2016) (dismissing allegations of infringement where claims required a system in which car radio and heat or air conditioning would not operate when seat belts were not buckled based on documents referenced in complaint that showed only the radio would not work when seat belt was not buckled in accused products); *Ottah v. BMW*, 230 F. Supp. 3d 192, 197-98 (S.D.N.Y. 2017) (dismissing allegations of infringement where evidence demonstrated that the accused devices did not meet the claim limitations and thus did not infringe the patent).  The Federal Circuit has affirmed dismissals with prejudice where the allegations of infringement were implausible.  *See Amgen Inc. v. Coherus Biosciences Inc.*, 931 F.3d 1154, 1160-61 (Fed. Cir. 2019); *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1141-42 (Fed. Cir. 2018).

The Court may only consider a limited universe of materials in evaluating this Motion to Dismiss.  In addition to the Complaint itself, the Court may consider the '169 Patent, ECF 1-1, which is attached and "is a part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).  The Court may also consider matters over which it may take judicial notice under Fed. R. Evid. 201.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.") (internal quotations omitted).  For the purposes of this Motion, the Court can and should take judicial notice of the prosecution history because it is a matter of public record and consists of the complete record of proceedings before the Patent Office.  *See SEMICAPS Pte Ltd. v. Hamamatsu Corp.*, 393 F. Supp. 3d 802, 806 n.2 (N.D. Cal. 2019) ("The court takes judicial notice of the prosecution history pursuant to Federal Rule of Evidence 201(b)(2), as it is a public record that consists of the complete record of the

proceedings before the PTO and includes the prior art cited during the examination of the patent.") (internal quotations omitted); *see also, e.g.*, *U.S. Rubber Recycling, Inc. v. ECORE Int'l*, No. CV0909516SJOOPX, 2011 WL 13043495, at *3 (C.D. Cal. Aug. 8, 2011) (taking judicial notice of prosecution history and materials therein because they were "documents that are not subject to reasonable dispute and that are capable of accurate and ready determination").

Finally, the Court can consider materials incorporated by reference in the Complaint.  The incorporation by reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  In the case at bar, U of M extensively cites to documents it attributes to Leica.  *See* ECF 1, ¶¶ 27, 30, 36, 37.  Based on U of M's extensive reliance on these documents in an effort to make out allegations that claim 1 is infringed, the YouTube video identified at, *inter alia*, paragraph 27 of the Complaint[4] and a Leica brochure referenced in, *inter alia,* the last sentence of paragraph 30 of the Complaint[5] are incorporated by reference and are properly considered when ruling on this Motion.  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (explaining that a document is incorporated by reference into a complaint when the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim"); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013) (applying incorporation by reference doctrine to allegedly infringing video game); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (applying incorporation by reference doctrine to websites cited in the complaint) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

---

[4] The Complaint identifies the video by its URL: https://www.youtube.com/watch?v=h8QcpSiORKM in the Complaint.  *See, e.g.*, ECF 1 ¶ 30.  A copy is being submitted to the Court on DVD.  *See* Sommer Dec. ¶ 2, Ex. A (YouTube video).

[5]   https://downloads.leica-microsystems.com/Leica%20TCS%20SP8/Brochures/Leica%20TCS%20SP8%20X-Flyer_EN.pdf.  *See* Sommer Dec. ¶ 5, Ex. D (Brochure).

### B.   Patent Infringement

#### 1.   Direct Infringement

"To prove direct infringement, the plaintiff must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Cross Med Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005).   "Literal infringement requires that each and every limitation set forth in a claim appear in the accused product." *Franks Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).   The doctrine of equivalents will support an infringement claim only if "the accused device contains an equivalent for each limitation not literally satisfied." *Wi-Lan, Inc. v. Apple Inc.*, 811 F.3d 455, 463 (Fed. Cir. 2016).

One limitation on the application of the doctrine of equivalents is prosecution history estoppel. Prosecution history estoppel "prevent[s] a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013).   Prosecution history estoppel can occur in two ways: (1) a narrowing amendment of the claims or (2) surrendering claim scope through argument.   *Conoco, Inc. v. Energy & Envtl. Int'l L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006).   For estoppel by argument, "the prosecution history must evince a clear and unmistakable surrender of subject matter." *Id.* at 1364 (citation omitted).   The relevant inquiry is an objective one and requires an evaluation of "whether a competitor would reasonably believe that the applicant has surrendered the relevant subject matter." *Id.* (citation omitted).   Whether prosecution history bars an assertion of the doctrine of equivalents is a question of law for the Court to decide.   *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337 (Fed. Cir. 2015).

#### 2.   Indirect and Willful Infringement

"Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement . . . ." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).   And, there can be no willful infringement without an act of infringement.   *See SynQor, Inc. v. Artesyn Techs., Inc.*, 635 Fed. App'x 891, 894-95 (Fed. Cir. 2015) (non-precedential) ("Having resolved the underlying issue of direct infringement in favor of

17

[defendant], the district court was correct to determine that [defendant] did not engage in willful infringement . . . .").

## V.   ARGUMENT

### A.   The Complaint, Its Attachments, and Materials Incorporated Therein Show that There Is No Plausible Claim for Direct Infringement

The Accused Leica SP8 Microscopes cannot plausibly infringe any claim of the '169 Patent. Instead of "exciting the plurality of fluorophores of the sample to emit fluorescence" with the claimed "supercontinuum white light pulse comprising an entire spectrum of white light," '169 Pat., 7:46-50 (claim 1),[6] the Complaint and the documents incorporated by reference therein all show that the accused Leica SP8 microscopes excite fluorophores by exciting them with up to eight narrow-band (1 nm) discrete wavelengths.  *See* Sommer Decl., ¶ 2, Ex. A (YouTube video) at 0:54-1:01; *id.*, ¶ 5, Ex. D (Brochure) at 1.

Direct infringement requires all elements of the claims be found in the accused products either literally or equivalently.  *See Cross Med. Prods.*, 424 F.3d at 1310.  Here, all claims explicitly require that "exciting" fluorophores be done with "said supercontinuum white light pulse."  '169 Pat., 7:46-50 (claim 1), 8:22-31 (claim 10), 9:1-8 (claim 19).  "[S]aid supercontinnum white light pulse" is an anaphoric claim term that refers to the earlier claimed "supercontinuum white light pulse comprising an entire spectrum of white light."  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (anaphoric phrases such as "said" and "the" refer back to the initial antecedent phrase).  Therefore, the claim language explicitly requires excitation by a "supercontinuum white light pulse comprising an entire spectrum of white light."[7]  '169 Pat., 7:46-50, 8:22-31, 9:1-8.

---

[6] Similar limitations are found in independent claims 10 and 19.  *See* '169 Pat., 8:22-31 (claim 10), 9:1-8 (claim 19).  The relevant portions of these claims are reproduced in full above.  *See supra* § III.A.

[7] While Leica disputes the allegation that its white light lasers generate an "entire spectrum of white light" as required by all claims of the '169 Patent, for the purposes of this motion, the Court need not address the issue of whether white light in the range of 470 to 670 nm is an "entire spectrum of white light" for purposes of resolving this Motion under Fed. R. Civ. P. 12(b)(6).

The accused products are Leica's SP8 confocal microscopes.  ECF 1, ¶¶ 25, 43.  According to the Complaint, these microscopes produce "a continuous spectral output between the wavelengths of 470 and 670 nanometers."  *Id.*, ¶ 30.  U of M admits that the accused SP8 microscopes have tunable excitation wavelengths.  *Id.*, ¶ 32 ("'By tuning both excitation and detection . . . .'").  The Court should consider the materials U of M quotes in the Complaint in their entirety to prevent U of M from cherry picking information it perceives as favorable and "omitting portions of those very same documents that weaken—or doom—[its] claims."  *Khoja*, 899 F.3d at 1002.  A review of these materials show that this tunability mentioned in the Complaint refers to the ability of a user to "select eight excitation lines."  Sommer Dec. ¶ 2, Ex. A (YouTube video) at 0:54-1:01.  This tunability is accomplished using a "acousto-optical beam splitter" that "instantaneously tunes up to eight excitation lines."  *Id.* at 1:16-1:29.  This allows the Leica SP8 microscopes to produce "finely tuned excitation . . . specific to every sample."  *Id.* at 1:40-1:57.  One of the brochures quoted in the Complaint shows that the "excitation lines" produced by the Leica SP8 microscopes are 1 nm wide (as opposed to the original white light spectrum generated between 470 nm and 670 nm).  Sommer Dec. ¶ 5, Ex. D (brochure) at 1.  Exciting a sample with as many as eight 1 nm "excitation lines" is a far cry from exciting a sample with a "***supercontinuum white light pulse*** comprising ***an entire spectrum of white light***" as required by all claims of the '169 Patent.  '169 Pat., 7:46-50, 8:22-31, 9:1-8.

Instead, the Leica products operate in a manner similar to the embodiment in Itoh, which the patentee distinguished in order to get the '169 Patent allowed in the first place.  As explained in detail above, the examiner rejected the claims of the application leading to the '169 Patent over, among other references, a reference to Itoh.  *See supra* § III.B; Sommer Dec. ¶ 3, Ex. B (Office Action) at 7-16; *see* Request for Judicial Notice.  As explained by the examiner, Itoh taught the generation of "continuous spectrum white light pulses" followed by the selection of "a plurality of objective wavelength components."  *Id.* at 7.  These wavelengths are then combined by "dispersing element 25 into a composite optical pulse containing the objective wavelength components" which are then "irradiated onto the bio-sample 28" to excite the fluorophores.  *Id.*  This is shown in the illustration above in § III.B—an annotated version of a figure from Itoh appearing in the Office Action—where a continuum

1    is generated and then portions of this spectral continuum are selected (i.e., "objective wavelength

2    components") for exciting the fluorophores.

3            In response, the applicants made it abundantly clear that Itoh's selection of distinct excitation

4    lines was "clearly different" and had "sharply different" consequences when compared to using "the

5    entire continuous spectrum *without filtering*."  Sommer Dec. ¶ 4, Ex. C (Amendment) at 12 (emphasis

6    added).  The applicants beat this drum repeatedly in their response to the rejection over Itoh.  They

7    argued that Itoh "select[s] several discrete wavelengths from a white light continuous spectrum,"

8    "merely uses discrete portions of light spectrum to excite only selected fluorophores," and does not use

9    "the entire spectrum."  *Id.* at 10, 12.  "In contrast, the present invention uses and claims the entire

10   spectrum of the white light to simultaneously excite all the fluorophores," and the invention "uses the

11   entire continuous spectrum of white light simultaneously as a unique excitation source."  *Id.* at 10, 11.

12           But, as explained above, contrary to the claimed alleged invention, the accused Leica SP8

13   microscopes use filtering—by an acousto-optical beam splitter—to select as many as eight "discrete

14   wavelengths from a white light continuous spectrum," just like the applicants argued Itoh did.

15   *Compare* Sommer Dec. ¶ 4, Ex. C (Amendment) at 10 *with id.* ¶ 2, Ex. A (YouTube video) at 0:54-

16   1:01, 1:16-1:29.  The public is entitled to rely on the applicants' representation to the Patent Office that

17   such a system is "clearly" and "sharply" different from the claims of the '169 Patent.  And, based on

18   the plain claim language and the applicants' representations regarding its import, so too is the Court.

19           The bald allegation found in paragraph 30 that "Leica advertises that its TCS SP STED, for

20   example, has 'a single-source white light generation system outputting a supercontinuum white light

21   pulse comprising an entire spectrum of white light, said supercontinuum white light pulse exciting the

22   plurality of fluorophores of the sample to emit fluorescence,'" ECF 1 ¶ 30, cannot save the day for U

23   of M.  First, this is a conclusory allegation that merely quotes the language of the claims without

24   pleading any specific facts.  Second, this allegation cannot be reconciled with the facts that *are* pled

25   and those that *are* of record through the incorporated documents and video.  The Court need not accept

26   as true allegations that are contrary to the materials that are properly considered when ruling on a Rule

27   12(b)(6) motion.  *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir.

28   2017) (When "ruling on a 12(b)(6) motion, a court need not accept as true allegations that contradict

1   matters properly subject to judicial notice or by exhibit, such as the claims and the patent

2   specification.") (internal quotations omitted).

3       As such, the allegations of direct infringement should be dismissed for failure to state a claim

4   upon which relief can be granted.

5   **B.**     **There Can Be No Infringement Under the Doctrine of Equivalents as a Matter of**

6           **Law**

7       Because the applicants made unequivocal and unambiguous arguments and amendments to

8   distinguish systems that used discrete wavelengths to excite fluorophores from the claimed invention

9   and because the accused products use the distinguished discrete excitation lines selected from the

10   generated white light laser pulse to excite fluorophores, any allegation of infringement under the

11   doctrine of equivalents is precluded by prosecution history estoppel.[8]

12       There are two aspects to prosecution history estoppel that apply here.  First, all independent

13   claims were amended to change the requirement of "a white light pulse, . . . said white light pulse

14   exciting" fluorophores such that the white light pulse was limited to a "<u>supercontinuum</u> white light

15   pulse <u>comprising an entire spectrum of white light</u>, said <u>supercontinuum</u> white light pulse exciting the"

16   fluorophores.  Sommer Dec. ¶ 4, Ex. C (Amendment) at 2 (amending claim 1).  Similar amendments

17   to add these features were made to claims 10 and 19.  *See id.* at 4 (amendment of claim 10), 6

18   (amendment of claim 19) (Amendment).  That this amendment was made for a reason related to

19   patentability is reflected in the arguments the applicants made to overcome the Itoh rejection.  For

20   example, the applicants argued that:

21           Itoh et al. teaches selecting several discrete wavelengths, not the entire

22           spectrum, to excite only those fluorophores that have excitation spectrum

---

[8] While the Complaint alleges no facts that would support the bald allegation that "Leica has directly . . . infringed . . . under the doctrine of equivalents," ECF 1, ¶ 43, *see also id.*, ¶ 25, this Motion explains why dismissal is appropriate as a matter of law even if U of M had presented sufficient factual allegations regarding the doctrine of equivalents.

matched with the selected discrete wavelengths.  In contrast, ***the present invention uses and claims the entire spectrum of white light to simultaneously excite all the fluorophores that have excitation spectra covered by the entire white light spectrum***.

*Id.* at 10 (emphasis added).  This shows that the amendments were made for a reason related to patentability.  These amendments thus give rise to a presumption that prosecution history estoppel bars the application of the doctrine of equivalents.[9]  *See EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1203 (Fed. Cir. 2014) ("There is a presumption that prosecution history estoppel applies when a patentee has filed an amendment seeking to narrow the scope of a claim" and the amendment is for a reason related to patentability.).

Even if the amendments were not enough to erect an estoppel, the arguments made by the applicants to obtain the patent certainly are.  The applicants repeatedly distinguished Itoh on the basis that it selects "several discrete wavelengths" and used "those discrete wavelengths"—"not the entire spectrum"—to excite the fluorophores.  Sommer Decl., ¶ 4, Ex. C (Amendment) at 10 (emphasis added).  The invention was "conceptually different from" Itoh's technique, "which use[s] selected wavelengths as an excitation source."  *Id.* at 11; *see also id.* at 12 (describing Itoh as using "discrete portions of light spectrum").  Instead, the "present invention ***uses the entire continuous spectrum of***

---

[9] While this is a presumption that may be rebutted by a showing that the equivalent was unforeseeable at the time of the amendment, the rationale underlying the amendment was tangential to the equivalent in question, or there is some other reason that the patentee could not be reasonably expected to have described the equivalent, *see Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002), no facts have been alleged to suggest that any of these exceptions would apply.  And none could plausibly apply.  The equivalent surrendered by the amendment was the selection of discrete excitation lines from a continuous spectrum and exciting the fluorophores with only those lines.  U of M cannot now claim that this very technique implemented by the Leica S8 confocal microscopes infringes under the doctrine of equivalents.

1  *white light simultaneously as a unique excitation source*." *Id.* at 11, 12.  The claimed technique is

2  clearly described as being "conceptually different," and "clearly" and "sharply" different from the

3  selection of discrete wavelengths from a continuum source.  *Id.* at 12.  These statements are clear and

4  unambiguous and would easily lead the public to "reasonably believe that the applicant ha[s]

5  surrendered the relevant subject matter." *Conoco*, 460 F.3d at 1364 (internal quotations omitted).

6      Having made these amendments and representations to obtain the '169 Patent, U of M cannot

7  now contend that a system like Leica's, where up to eight discrete excitation lines are used to excite

8  the fluorophores in the sample, is substantially the same as the claimed subject matter so as to infringe

9  under the doctrine of equivalents.

10     Therefore, dismissal of the allegations of infringement under the doctrine of equivalents is also

11  appropriate as a matter of law.

12  **C.    There Can be No Indirect or Willful Infringement**

13     Because the Complaint does not state a plausible claim for direct infringement for the reasons

14  discussed above, there can be no indirect infringement as a matter of law. *See Dynacore*, 363 F.3d at

15  1272.  And it is axiomatic that in the absence of infringement there can there be no willful infringement.

16  *See SynQor*, 635 Fed. App'x at 894-95.  Therefore, dismissal of claims of indirect infringement

17  naturally follow from the dismissal of the direct infringement claims and is warranted here.

18  **D.    This Action Should be Dismissed With Prejudice**

19     Dismissal should be with prejudice here because amendment would be futile.  This case is one

20  of the somewhat unusual patent cases in which a patentee has presented a claim that is so implausible

21  on the facts that it has pled itself out of court.  *Weissuch*, 119 F.3d at 783 n.1; *see also supra* § IV.A

22  (collecting patent cases dismissed for failure to state a plausible claim of infringement and dismissing

23  them with prejudice).  No amount of repleading can change the patent claims, the prosecution history,

24  or the way that Leica's products operate.  Therefore, dismissal with prejudice is warranted.

25  **VI.    CONCLUSION**

26     For the reasons explained above, the Complaint fails to allege a plausible claim upon which

27  relief should be granted.  Therefore, it should be dismissed with prejudice.

28

1

2   DATED:  January 15, 2020                    **GREENBERG TRAURIG, LLP**

3                                               By: ___/s/_____

4                                               David S. Bloch
                                                blochd@gtlaw.com
5                                               GREENBERG TRAURIG, LLP
                                                4 Embarcadero Center, Suite 3000
6                                               San Francisco, CA 94111-5983
                                                Telephone: 415.655.1300
7                                               Facsimile: 415.520.5609

8
                                                *Attorneys for Defendant Leica Microsystems Inc.*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28