UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE REGENTS OF THE UNIVERSITY
OF MICHIGAN,

        Plaintiff,

    v.

LEICA MICROSYSTEMS INC.,

        Defendant.

Case No. 19-cv-07470-WHO

**ORDER ON THE MOTION TO
DISMISS AND THE MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 135, 136, 137, 138, 151, 153,
157

      In this action, the University of Michigan ("the University" or "Michigan") alleges direct, indirect, and willful patent infringement related to a patent it owns. The patent in suit, Patent No. 7,277,169 (the '169 Patent), relates to a fluorescence detection system. Two motions are now pending. Defendant Leica Microsystems Inc. ("Leica") first filed a Motion to Dismiss for Lack of Standing ("MTD") [Dkt. No. 135], and then filed a Motion for Summary Judgment of Noninfringement ("MSJ") [Dkt. No. 138]. For the reasons discussed below, Leica's motion to dismiss for lack of standing is DENIED and its motion for summary judgment of noninfringement is GRANTED.

## BACKGROUND

      Michigan alleges that Leica infringes upon the '169 Patent, entitled "Whole Spectrum Fluorescence Detection With Ultrafast White Light Excitation." Complaint ("Compl.") [Dkt. No. 1] ¶ 9. The patent concerns a system used in microscopes wherein fluorescent labels are used to "tag" molecules that are placed on a sample or a microscope slide. Compl. ¶¶ 15–16. Traditionally, fluorescent systems used fluorescent detection to allow a microscope user to view a single "tagged" molecule within a sample. *Id.* The '169 Patent specifically claims a "novel fluorescent detection technology using a white light laser and a time-resolving detector." Compl.

United States District Court
Northern District of California

¶ 20.  Michigan asserts that these innovative technologies allow for a researcher to view multiple tagged molecules and measure the amount of fluorescence, and therefore quantity of specific molecules in a sample, all at once.  *Id.*  It accuses Leica's SP8 and Stellaris microscope models (the "Accused Products") of infringing upon the '169 Patent.  Compl. ¶¶ 49–52.  The underlying technology is discussed in more detail where relevant in the "Discussion" section below.

### A.    Relevant Procedural Posture

Michigan filed its initial complaint on November 13, 2019.  *See* Compl.  In July 2020, Leica filed a petition for *inter partes* review before the Patent Trial & Appeal Board ("PTAB"), challenging the validity of every claim of the '169 Patent, and moved to stay the case in this court. Motion to Stay [Dkt. No. 66] 5.  On January 7, 2022, the PTAB concluded that all challenged claims of the '169 Patent were valid and patentable.  Status Report [Dkt. No. 75] 1.  On April 24, 2023, the Federal Circuit affirmed.  *Id.*  After lifting the stay in June of 2023, I granted Michigan leave to amend its infringement contentions on October 26, 2023.  Dkt. Nos. 76, 95.  Parties agreed that a hearing on their proposed claim construction was unnecessary, and I filed an order construing parties' disputed claim terms on February 14, 2024.  Dkt. No. 113.

Leica filed its motion to dismiss and its motion for summary judgment on August 20, 2024.  Dkt. Nos. 135, 138.  I granted Michigan's unopposed motion to serve its second amended infringement contentions on October 8, 2024.  Dkt. Nos. 162–63.  I heard argument from the parties on Leica's motions on November 6, 2024.

### B.    Asserted Claims

The '169 Patent contains three independent claims: Claims 1, 10, and 19.  The remainder of the 26 Claims are dependent claims.  If Leica can demonstrate that there is no genuine dispute that it does not infringe on the independent claims, it necessarily demonstrates that it does not infringe on any claim in the '169 Patent.  *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1358–1360 (Fed. Cir. 2007).

Claim 1 of the '169 Patent claims:

A fluorescence detection system for testing a sample, said sample having a plurality

2

of fluorophores, said fluorescence detection system comprising:

a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, said supercontinuum white light pulse exciting the plurality of fluorophores of the sample to emit fluorescence; and

a time resolving detector receiving said fluorescence and at least a portion of said supercontinuum white light pulse, said time-resolving detector separating said fluorescence from said portion of said supercontinuum white light pulse.

'169 Patent [Dkt. No. 1-1] 7: 40-55.

Claim 10 of the '169 Patent claims:

A fluorescence detection system for testing a sample, said sample having a plurality of fluorophores, said fluorescence detection system comprising:

a single laser source outputting a laser pulse having a first time duration;

a member having a non-linear refractive index, said member receiving said laser pulse therethrough and outputting a supercontinuum white light pulse comprising an entire spectrum of white light, said supercontinuum white light pulse having a first frequency range and a second time duration, said supercontinuum white light pulse exciting the plurality of fluorophores of the sample to emit fluorescence, said fluorescence having a second frequency range and a third time duration, said second time duration being less than said third time duration; and

a time-resolving detector receiving said fluorescence and at least a portion of said supercontinuum white light pulse, said time-resolving detector separating said fluorescence from said portion of said supercontinuum white light pulse.

*Id.* at 8:19-39.

Claim 19 of the '169 Patent claims:

A fluorescence detection system for testing a sample, said sample having a first fluorophore and a second fluorophore, said fluorescence detection system comprising:

a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, said supercontinuum white light pulse having a first frequency range and a first time duration, said supercontinuum white light pulse exciting the first fluorophore and the second fluorophore to emit a first fluorescence and a second fluorescence respectively, said first fluorescence having a second frequency range that is different than a third frequency range of said second fluorescence, said first fluorescence having a second time duration and said second fluorescence having a third time duration, said first time duration being less than said second time duration and said third time

3

1

duration; and

2

a time-resolving detector receiving said first fluorescence, said second

3

fluorescence, and at least a portion of said supercontinuum white light pulse, said
time-resolving detector separating said first fluorescence and said second

4

fluorescence from said portion of said supercontinuum white light pulse.

*Id.* at 8–9: 65-20.

5

### C.      Relevant Claim Construction

6

I have construed a number of claim terms relevant to the motions before me.  I include a

7

chart summarizing my conclusions at Dkt. No. 113 below:

8

9

| Claim Term | Construction |
|---|---|
| "A fluorescence detection system for testing a sample, said sample having a plurality of fluorophores, said fluorescence detection system comprising" (Claim 1, Claim 10) | The sample containing a plurality of fluorophores is a required element of the claim. |
| "A fluorescence detection system for testing a sample, said sample having a first fluorophore, said fluorescence detection system comprising" (Claim 19) | The sample containing a plurality of fluorophores is a required element of the claim. |
| "exciting" | Plain and ordinary meaning |
| "outputting" | Plain and ordinary meaning |
| "said supercontinuum white light pulse exciting the plurality of fluorophores of the sample to emit fluorescence" (Claim 1, Claim 10) | Plain and ordinary meaning |

| "said supercontinuum white light pulse exciting the first fluorophore and the second fluorophore to emit a first fluorescence and a second fluorescence respectively" (Claim 19) | Plain and ordinary meaning[1] |
|---|---|

### D. Leica's Motions

Leica first moves to dismiss the case for lack of subject matter jurisdiction, arguing that Michigan lacks constitutional standing to bring this action because it is not the sole owner of the '169 Patent and it neglected to join an alleged co-owner as a necessary party. MTD 1–2. In its Reply, Leica argues in the alternative that Michigan lacks statutory standing for the same reason. MTD Reply 3. Michigan responds that Leica's motion is really a motion for summary judgment and that, when viewed in this light, Leica is unable to meet its burden to demonstrate a lack of genuine issue of material fact. I agree.

Leica further seeks summary judgment for noninfringement of all claims. Michigan argues that there are material disputes of fact about whether the Accused Products infringe upon the '169 Patent. But Leica asserts that there is no dispute regarding how the Accused Products work and that Michigan's arguments concern an issue of claim interpretation that is to be determined by the court. Leica moves for summary judgment on two distinct theories of non-direct infringement and argues that because it does not directly infringe upon the '169 Patent, it cannot be found to indirectly infringe upon the Patent.

First, Leica argues that the Accused Products do not meet the "said supercontinuum" terms as required by Claim 1, Claim 10, and Claim 19. An absence of genuine dispute about how the fluorescence system excites the fluorophores of a sample, and whether "a supercontinuum white light pulse comprising an entire spectrum of white light" excites the fluorophores, would justify summary judgment on all claims. MSJ 2. Second, Leica contends that the Accused Products do not use a "single-source white light generation system" as required by Claims 1 and 19 or a

---

[1] For the latter two claim terms, I specifically noted that "[t]hese terms will be given their plain and ordinary meaning without any other construction, but with the assistance of expert testimony at trial." Claim Construction Order [Dkt. No. 113] 5.

United States District Court
Northern District of California

1   "single laser source" as required by Claim 10.  An absence of genuine dispute about these

2   requirements would likewise justify summary judgment.  Finally, it contends that it additionally

3   escapes direct infringement because the Accused Products do not include sample slides and that

4   Michigan has waived any argument in support of indirect infringement.  Because I conclude that

5   Leica has met its burden regarding its first argument, and that there is no genuine dispute of

6   material fact whether the Accused Products meet the "said supercontinuum" terms required by

7   Claims 1, 10, and 19, I grant Leica's motion for summary judgment on those grounds and decline

8   to address its additional arguments.

9                                    **LEGAL STANDARDS**

10  **I.      SUMMARY JUDGMENT**

11          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

12  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

13  law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

14  show the absence of a genuine issue of material fact with respect to an essential element of the

15  non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

16  persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

17  made this showing, the burden then shifts to the party opposing summary judgment to identify

18  "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary

19  judgment must then present affirmative evidence from which a jury could return a verdict in that

20  party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

21          On summary judgment, the court draws all reasonable factual inferences in favor of the

22  non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

23  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

24  facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony

25  does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

26  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

27  **II.     SUMMARY JUDGMENT OF NONINFRINGEMENT**

28          Summary judgment of noninfringement requires a two-step analysis.  "First, the claims of the

1    patent must be construed to determine their scope.  Second, a determination must be made as to

2    whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-*

3    *Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted).  "The

4    determination of infringement, both literal and under the doctrine of equivalents, is a question of

5    fact." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003); *see*

6    *also Kilopass Tech. Inc. v. Sidense Corp.*, No. 10-cv-02066-SI, 2012 WL 3545286, at *4 (N.D.

7    Cal. Aug. 16, 2012).  Because the ultimate burden of proving infringement rests with the patentee,

8    an accused infringer may show that summary judgment of noninfringement is proper either by

9    producing evidence that would preclude a finding of infringement, or by showing that the

10    evidence on file fails to create a material factual dispute as to any essential element of the

11    patentee's case. *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir.

12    2001).  "Summary judgment of noninfringement may only be granted if, after viewing the alleged

13    facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the

14    nonmovant's favor, there is no genuine issue whether the accused device is encompassed by the

15    patent claims." *Id.*

16        Direct infringement may be proven either by literal infringement or under the doctrine of

17    equivalents.  "Literal infringement requires the patentee to prove that the accused device contains

18    each limitation of the asserted clai[m]." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d

19    1241, 1247 (Fed. Cir. 2000).  "If any claim limitation is absent from the accused device, there is

20    no literal infringement as a matter of law." *Id.*  "The doctrine of equivalents holds that even if an

21    accused product does not literally infringe the asserted claims of a patent, the product may infringe

22    if the differences between the element of the accused product at issue and the claim limitation at

23    issue are insubstantial." *Kilopass*, 2012 WL 3545286, at *7.  To defeat a defendant's motion for

24    summary judgment of noninfringement under the doctrine of equivalents, the plaintiff must

25    provide "particularized testimony and linking argument on a limitation-by-limitation basis that

26    create[s] a genuine issue of material fact as to equivalents." *AquaTex Indus., Inc. v. Techniche*

27    *Sols.*, 479 F.3d 1320, 1328–29 (Fed. Cir. 2007).  "Whether equivalency exists may be determined

28    based on the 'insubstantial differences' test or based on the 'triple identity' test, namely, whether

1   the element of the accused device performs substantially the same function in substantially the

2   same way to obtain the same result." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d

3   1364, 1376 (Fed. Cir. 2008). "Whether a claim is infringed under the doctrine of equivalents may

4   be decided on summary judgment if no reasonable jury could determine that the limitation and the

5   element at issue are equivalent." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir.

6   1999).

### DISCUSSION

7   **I.   Leica's Motion to Dismiss[2]**

8

9        Leica styles its first motion as a Motion to Dismiss, alleging that in the course of

10   discovery, it uncovered facts that demonstrate that this court lacks subject matter jurisdiction

11   under Fed. R. Civ. P. 12(b)(1) because the University lacks constitutional standing to bring this

12   patent infringement suit. *See generally* MTD. In its motion, Leica argues that one of the original

13   inventors of the patent, Dr. James Baker, assigned his rights to the Patent to a company he co-

14   founded, NanoBio (later renamed BlueWillow Biologics, Inc.). MTD 1. Leica contends that

15   because NanoBio never thereafter assigned its rights in the '169 Patent to the University,

16   "Michigan never acquired NanoBio's rights in the Asserted Patent and, therefore, Michigan never

17   owned the Asserted Patent, but instead is at best a co-owner of the Asserted Patent with

18   NanoBio." MTD 2. Leica argues that because of Michigan's failure to join BlueWillow,

19   Michigan ran afoul of the Federal Circuit's well settled mandate that ordinarily "[a]n action for

20

21

---

22   [2] Leica's administrative motions to seal another party's material (Dkt. Nos. 135, 137, 157) and

23   Michigan's motion to seal (Dkt. No. 151) are GRANTED in part and DENIED in part. As supported by declarations provided by Michigan, Leica's Exhibits 23, 24, 33, 34, and 36 may

24   remain sealed, given the personnel information and irrelevance of the attached discovery responses. The sealing motions are DENIED with respect to Leica's exhibit 6, as Michigan has

25   not shown disclosure of that generalized Restrictive Covenants Agreement could possibly cause it

26   or any third-party economic harm and has failed to justify the compelling justifications standard. As a result, the clerk shall UNSEAL Dkt. Nos. 135-3, 135-4, 151, and 157. The clerk shall also

27   UNSEAL Leica Exhibits 7-17 & 25 filed at Dkt. Nos. 135-5–135-15, which Michigan does not seek to seal.

28

infringement must join as plaintiffs all co-owners." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998).  Michigan is the only plaintiff in this case.  Leica concludes that I must grant its motion to dismiss for this reason.  Not so.  Leica has seemingly overlooked the Federal Circuit's more recent conception of standing requirements in infringement suits.

In 2019, the Federal Circuit decided *Lone Star Silicon Innovations LLC v. Nanya Technology Corporation*.  925 F.3d 1225 (Fed. Cir. 2019).  On the matter of constitutional standing, the court clarified that "constitutional standing . . . does not depend on labels; it is the substance of the allegations that matters."  *Id.* at 1234.  Here, even assuming Leica's allegations concerning ownership of the '169 Patent to be accurate, "[t]he fact that [Michigan] believed its rights included all substantial rights does not mean its allegations fall short of alleging a cognizable injury."  *Id.*  Michigan therefore has constitutional standing to bring this case.[3]

*Lone Star* also addressed statutory standing in infringement cases.  The Federal Circuit once treated statutory standing granted pursuant to 35 U.S.C. § 281 as a jurisdictional requirement. *Id.*; 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent.").  But in the wake of the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, where the Court clarified the distinction between 'statutory standing' and jurisdictional requirements, the Federal Circuit noted that "following *Lexmark*, several courts have concluded that motions to dismiss based on 'statutory standing' defects are properly brought under Rule 12(b)(6) rather than Rule 12(b)(1) in recognition of the fact that such defects are not jurisdictional."  *Lone Star*, 925 F.3d at 1235 (citing *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1001 (9th Cir. 2015)); *see also* 35 U.S.C. § 281.  The Federal Circuit stated:

---

[3] Leica cites to *Regents of University of California v. LTI Flexible Products, Inc.*, a previous case before me, which addressed matters of statutory standing.  2022 WL 1569287, No. 3:20-cv-08686-WHO (N.D. Cal. May 18, 2022).  That case is best understood as one where the defendant was alleged to have infringed upon a patent that he owned—an impossible allegation and one not relevant here.

United States District Court
Northern District of California

"We therefore firmly bring ourselves into accord with *Lexmark* and our sister circuits by concluding that whether a party possesses all substantial rights in a patent does not implicate standing or subject-matter jurisdiction." *Lone Star*, 925 F.3d at 1235.

In response to the University's Opposition to the Motion to Dismiss, Leica in its Reply argues in the alternative that Michigan lacks statutory standing under Federal Rule of Civil Procedure 12(b)(6).[4] *See* MTD Reply 3–11.  But pursuant to Federal Rule of Civil Procedure 12(b), a "motion asserting any of these defenses," including 12(b)(6), failure to state a claim upon which relief can be granted, "must be made before pleading if a responsive pleading is allowed." That time has now passed.  *See* Answer to Complaint [Dkt. No. 57] (filed May 14, 2020).

Because of its timing, and its reliance on evidence outside the Complaint, *see* Dkt. Nos. 135, 136 (including 35 additional exhibits), Leica's motion is better construed as a Motion for Summary Judgment.  *See Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1532 (9th Cir. 1985) ("Whenever a district court looks beyond the pleadings in evaluating a Rule 12(b)(6) motion to dismiss, the motion must be treated as one for summary judgment under Rule 56.").  And my standing order for civil cases dictates: "Parties are limited to filing one motion for summary judgment.  Any party wishing to exceed this limit must request leave of Court."  Judge Orrick Standing Order No. 7 (effective May 2023).  Leica has filed a motion for summary judgment for noninfringement at Dkt. No. 138.  I deny Leica's motion titled "Motion to Dismiss" as a second motion for summary judgment and consider only its "Motion for Summary Judgment of Noninfringement."[5]

---

[4] I note that "[t]he district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Because Leica's argument in the alternative is limited to issues raised in Michigan's Opposition, I find that Leica's arguments concerning 12(b)(6) statutory standing are appropriately raised in Reply.

[5] Although I decline to substantively address Leica's arguments within its "Motion to Dismiss," I briefly note that it is unlikely that Leica could have met the summary judgment burden to show that "there is no genuine dispute of material fact" that Dr. Baker never assigned his interest in the

## II.    Leica's Motion for Summary Judgment of Noninfringement[6]

### A.    The Claimed System

In its Complaint, Michigan claims that Leica infringes on the '169 Patent literally or under the doctrine of equivalents in relevant part to this motion because the Accused Products use "a single-source white light generation system outputting a supercontinuum white light pulse comprising an entire spectrum of white light, said supercontinuum white light pulse exciting the plurality of fluorophores of the sample to emit fluorescence." Compl. ¶¶ 25–29; '169 Patent [Dkt. No. 1-1] 7: 46-50.[7] According to the University, the system proceeds in the following manner:

A user first acquires a sample to view, typically in the form of a microscopy slide, that has previously been dyed with fluorescent dyes that can label individual parts of a cell. For example, fluorescence can be used to tag the nucleus of a cell or specific proteins. The user next places the slide in the appropriate place for the fluorescence detection system to pass through light waves so as to excite specific fluorophores—resulting in a specific fluorescence (color) that is viewable to the user. In the claimed system, a white light pulse is used to excite these fluorophores. Use of

---

'169 Patent to the University. Some genuine disputes of material fact continue to exist—for example: (1) Whether Dr. Baker's contract with Nanobio cabining his assignment of patents to those "matters relating to antimicrobial nanoemulsions" encompassed the patent at issue here; [Dkt. No. 135-4] (2) If the "NASA Proposal Approval" form concerning the proposed work to invent the claimed system showing signatures from Michigan staff mirrors the final approval by NASA; [Dkt. No. 135-5,6] or (3) Whether BlueWillow would be amenable to being joined in this suit. Further, I choose to address Leica's second-filed motion for summary judgment instead of its first due to the dispositive nature of the issues raised in it.

[6] The University's administrative motion to seal another party's material [Dkt. No. 153] is GRANTED in part. As supported by declarations provided by Leica, Michigan's Exhibits 20, 25, 26, 29, 35, 36, and 40 filed at Dkt. No. 153 may remain sealed. Leica does not oppose disclosure of Michigan's other sealed exhibits. As a result, the clerk shall UNSEAL Dkt. Nos. 153-3–11, 153-15, 153-17, and 153-18.

[7] Although in its Complaint and in its amended infringement contentions, the University asserted infringement under the doctrine of equivalents citing to the full claim statement, in its Opposition to the Motion for Summary Judgment and during the hearing on these motions, Michigan repeatedly clarified that it is not asserting a doctrine of equivalents argument as it relates to the latter portion of the claim (concerning the "said supercontinuum" language). Compl. ¶ 25; Transcript of November 6 Motions Hearing [Dkt. No. 184] 6.

United States District Court
Northern District of California

this white light pulse, as opposed to traditional methods using several, narrower wavelengths for fluorophore excitation, allows for multiple fluorescent markers to be detected in a single sample. A user can therefore measure the amount of fluorescence for each individual tag contained in a sample all at once.

**B.  Leica's Noninfringement Arguments**

Leica contends that it does not infringe upon the '169 patent.  Leica offers two separate grounds for lack of infringement, asserting that there is no dispute of material fact that its system does not infringe upon Claims 1, 10, and 19 of the '169 patent.  As background to its asserted grounds for noninfringement, Leica highlights what it finds to be major distinguishing characteristics of its system: the use of filters and the source of the white light laser.

Leica's expert, Dr. Knox, explains the use of filters as follows.  In the traditional approach to fluorescence microscopy, separate, single wavelength lasers are used to excite individual fluorophores.



Knox Decl. [Dkt. No. 138-25] 9.  But because of the "cost and complexity" of using multiple lasers, patentees sought a more refined approach.

In Dr. Knox's view, Michigan and Leica confronted the problem in divergent ways. Michigan, to begin, uses a "supercontinuum laser source" with no filter, eventually settling on the use of the fast pulsed white light laser to excite a sample and a "time-resolving" detector to distinguish a sample's fluorescence from additional scattered light emitted from the white light

laser.  As presented by Leica's rendering, Michigan's approach uses no filter:



Knox Decl. 10.

Leica, on the other hand, passes a white light laser through an acousto-optical filter, requiring a user to select individual wavelengths (up to eight at a time) to excite fluorophores. Leica's method, it asserts, "prevents the entire spectrum of the [white light laser] from entering the microscope system."  MSJ 9.  All of the Accused Products operate in this way.  Dr. Knox's visualization of this method is below:



Knox Decl. 12.

Leica finally presents its understanding that "the Accused Products use multiple light sources to generate their output."  Before the ultimate white light is emitted, filtered, and subsequently used to excite the fluorophores of a sample, the Accused Products use "large, sophisticated laser systems that include a complex arrangement of circuitry, fiber optics, and multiple light sources."  MSJ 10.

NKT Photonics SuperK Extreme EXW-12 Laser System

Knox Decl. 18. Leica asserts that each pump diode laser, pictured above, acts as a separate light source, each contributing to the final white light laser responsible for exciting fluorophores of a sample. MSJ 10–11.

### 1. "Said Supercontinuum" Terms

Each asserted claim requires a "supercontinuum white light pulse comprising an entire spectrum of white light," with claims 1 and 10 additionally requiring that "said supercontinuum white light pulse excit[e] the plurality of fluorophores of the sample to emit fluorescence" and claim 19 relatedly requiring that "said supercontinuum white light pulse excit[e] the first fluorophore and the second fluorophore to emit a first fluorescence and a second fluorescence respectively." '169 Patent claims 1, 10, 19. I previously construed the "said supercontinuum" terms to have their plain and ordinary meaning. Claim Construction Order [Dkt. No. 113] 4–5. Now, parties dispute what that plain and ordinary meaning is with respect to the proper scope of the term "said supercontinuum." Because resolution of this dispute is fundamentally a question of law, I will further construe the language to clarify the scope of the plain and ordinary meaning of "said supercontinuum." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Leica maintains that its microscopy configuration does not allow "said supercontinuum" to

---

[8] Leica's multi-laser system is provided by an outside entity, not party to this suit.

United States District Court
Northern District of California

United States District Court
Northern District of California

act in the manner required by the '169 patent. Specifically, because the term "said" must be construed to mean "a supercontinuum white light pulse comprising an entire spectrum of white light," Leica's use of an acousto-optical filter necessarily prevents "an entire spectrum of white light" from exciting fluorophores. MSJ 16–17 (citing *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (holding that "claims using the term 'said' are anaphoric phrases, referring to the initial antecedent phrase") (internal quotation marks and citation omitted)). And because "something far less than an entire white light spectrum is being used to excite the fluorophores," Leica contends, it is entitled to summary judgement for noninfringement. MSJ Reply 4.

Michigan does not contest that "said" in the context of the '169 patent refers back to "a supercontinuum white light pulse comprising an entire spectrum of white light." Piston Decl. [Dkt. No. 153-4] 13–14. It instead argues that Leica misstates the claim language, unnecessarily imposing restrictions on what the '169 patent claims. The '169 patent does not, per Leica's framing, state that "said supercontinuum . . . must be received by the sample or the plurality of fluorophores." *Id.* Instead, Michigan contends, "the claims specify that when the supercontinuum white light pulse is output from the single-source white light generation system, it comprises an entire spectrum of white light." *Id.* at 14. Following the University's understanding, then, the claims do not address to what extent "said supercontinuum" must reach the sample—only that the system "output[s] . . . said supercontinuum." *Id.*; '169 Patent at 7:45-50. Since it is uncontested that the Accused Products output "said supercontinuum," Michigan maintains that the dispute lies in whether the language of the '169 Patent requires that the entirety of "said supercontinuum" reach the sample or not.

Michigan asserts that there is no need for the court to further construe the plain and ordinary meaning of this claim. It contends that the parties are in obvious dispute about how a person having ordinary skill in the art ("PHOSITA") would apply the plain and ordinary meaning

15

of "said supercontinuum" in the context of the '169 patent.  Michigan cites several cases in which courts determined that the resolution of this question is best left up to a jury.  *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Defendants attempted to resurrect a claim construction that the district court already rejected without offering a new definition.  Restating a previously settled argument does not create an 'actual dispute regarding the proper scope of the claims' . . . the district court was not obligated to provide additional guidance to the jury."), *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction. . . . It was up to the jury to determine from the evidence presented at trial whether [the Accused Product] satisfied the plain and ordinary meaning of the [claim term]."), *Cave Consulting Grp., LLC v. OptumInsight, Inc.*, No. 5:11-CV-00469-EJD, 2015 WL 740379 at *15 (N.D. Cal. Feb. 20, 2015) ("[D]isputes over how one skilled in the art would understand the plain meaning of [a] term raises a factual question that must be resolved by the jury.").

None of Michigan's cited cases address the issue of claim scope presented here—rather, the cases involve a district court's decision to apply the plain and ordinary meaning of terms as an appropriate course of action when "at trial parties may introduce evidence as to the plain and ordinary meaning of the terms . . . so long as the evidence does not amount to arguing claim construction to the jury." *Cave Consulting Grp.*, 2015 WL 740379 at *15.  Claim construction itself, however, is done to "determine[e] the meaning and scope of the patent claims asserted to be infringed." *Markman*, 52 F.3d at 976.  "When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  And, "[a] determination that a claim term . . . has the 'plain and ordinary meaning' may be inadequate when . . . reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.

16

Because the parties now do not dispute what "said supercontinuum" refers to, but instead as to how "said supercontinuum" applies in the context of the '169 Patent, I must resolve the parties' dispute. I do so in favor of Leica for three reasons.

First, as I have already mentioned, and Michigan does not contest, the specific term "said" is an anaphoric phrase, meaning that it "takes its reference . . . from a preceding word or phrase." *Anaphoric*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/anaphoric (last visited Dec. 20, 2024); *see* MSJ 16. The Federal Circuit has held that anaphoric phrases using the word "said" "must refer" back to the original clause containing the term at issue. *Infernal Tech., LLC v. Activision Blizzard Inc.*, No. 2021-2349, 2023 WL 370602 at *3 (Fed. Cir. Jan. 24, 2023). Here, "said supercontinuum" is more fully described as "a supercontinuum white light pulse comprising an entire spectrum of white light." '169 Patent. In all instances where "said supercontinuum" is used in the '169 Patent, "a supercontinuum white light pulse comprising an entire spectrum of white light" must be substituted. As is relevant here, Claims 1 and 10 could therefore be restated as: "a supercontinuum white light pulse comprising an entire spectrum of white light exciting the plurality of fluorophores" and Claim 19 could be restated as "a supercontinuum white light pulse comprising an entire spectrum of white light exciting the first fluorophore and the second fluorophore to emit a first fluorescence and a second fluorescence respectively." '169 Patent. The claim language therefore requires that what is exciting the fluorophores consists of the full white light spectrum. The University's argument that the claim language does not require that the full spectrum actually *reach* the sample is inconsistent with what the plain and ordinary language of the terms suggest.

Second, looking to the patent prosecution history, it is clear that at one point in time, Michigan sought to highlight the unique nature of its claimed invention in order to differentiate it from the prior art. The relevant claims had been rejected as unpatentable over two prior patents: Itoh et al. and Fernandez et al. Claim Amendment [Dkt. No. 98-13] at 11. In an amendment filed

before the United States Patent and Trademark Office, the application stated:

> At the outset, Applicants respectfully submit that Itoh et al. and Fernandez et al., either singly or in combination, fail to teach or suggest each and every element of the claimed invention. Specifically, Itoh et al. teaches selecting several discrete wavelengths from a white light continuous spectrum and using those discrete wavelengths, not the entire spectrum, to excite only those fluorophores that have excitation spectra matched with the selected discrete wavelengths. In contrast, the present invention uses and claims the entire spectrum of the white light to simultaneously excite all the fluorophores that have excitation spectra covered by the entire white light spectrum. Itoh et al. and Fernandez are silent in this regard.

*Id.*

At the hearing on the pending motions, counsel for Michigan attempted to distinguish Itoh through reference to the time resolving detector, not at issue in this motion. *See* Hearing Transcript [Dkt. No. 184] at 5–6 ("[W]ith the present invention, you can use a spectrum of light to simultaneously excite the fluorophores, and because it has a time-resolving detector. That's not possible in Itoh, because Itoh does the separation of the wavelengths to arrive one at a time by giving them different path lengths."). The University's explanation at the hearing is somewhat inconsistent with the plain language used in its amendment emphasizing that "the entire spectrum of the white light . . . simultaneously excite[s] all the fluorophores," and it does not explain away the clear intended scope of the claimed language. For this additional reason, I agree with Leica that the "said supercontinuum" requires the understanding that it is "a supercontinuum white light pulse comprising an entire spectrum of white light" that leads to the excitation of the fluorophores present in a sample. *See Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008) ("When construing claims, the claims and the rest of the patent, along with the patent's prosecution history . . . are the primary resources.").

Third, because Michigan had ample opportunity to clarify its now-presented scope and demonstrated its ability to do so elsewhere in the '169 Patent, I further agree with Leica on the scope of the "said supercontinuum" language. Michigan consistently argues that, in its view, "less

than the full supercontinuum white light pulse is required to reach the sample."  Piston Decl. ¶ 66; Oppo. 11–12 ("a [PHOSITA] would understand that 'said supercontinuum white light pulse' excites the fluorophores regardless of whether 2 or 200 wavelengths reach the sample because the light for excitation comes from the supercontinuum white light pulse.").  But elsewhere in the '169 Patent, when describing the time resolving detector, Claims 1, 10, and 19 each claim "a time-resolving detector receiving said fluorescence and *at least a portion of said supercontinuum white light pulse*, said time-resolving detector separating said fluorescence from *said portion of said supercontinuum white light pulse*."  '169 Patent (emphasis added).  Referring to "'*at least a portion of* [said supercontinuum]' indicate[s] that the patentee knew how to draft a limitation that refers to a subset of the [said supercontinuum]."  *Infernal Tech.*, 2023 WL 370602, at *3.  That Michigan chose not to do so here indicates that it did not intend to do so when drafting its patent. It cannot attempt to do so now.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.") (citations omitted).

For all these reasons, I therefore conclude that the scope of the "said supercontinuum" language necessarily refers to "a supercontinuum white light pulse comprising an entire spectrum of white light" as what excites the fluorophores present in a sample.

### 2.  Bandlets and Lambda-Lambda Scans

In its Opposition, Michigan additionally asserts that, even accepting Leica's understanding that the plain and ordinary meaning of "said supercontinuum" describes the scope of the terms I have explained above, the Accused Products still infringe upon the '169 patent.  Specifically, Dr. Piston explains "two instances in which the Accused Products excite the plurality of fluorophores with a continuum of white light:" the Accused Products' use of (1) "bandlet" excitation, and (2) "lambda scans."  Piston Decl. ¶ 72–91; MSJ Oppo. 15–18.  These arguments are unpersuasive.

United States District Court
Northern District of California

### a. Bandlets

Leica represents that the Accused Products only allow a user to select up to a maximum of "eight individual discrete wavelengths from the [white light laser] to illuminate the sample." Knox Decl. [Dkt. No. 138-25] 12.  While it is uncontested that the entire spectrum of white light spans several hundred nanometers wide, the discrete wavelengths each have "a width of a couple of nanometers depending on the color."  The White Confocal – Spectral Gaps Closed White Paper [Dkt. No. 153-7] at 7.  Far from "comprising an entire spectrum of white light," the Accused Products use only segments of the spectrum at a time.

Michigan argues that Leica's representation is incorrect.  Dr. Piston explains that, contrary to Leica's assertion that its products "use individual wavelengths," the Accused Products are actually "configured to send a 'bandlet,' which is a continuous entire spectrum of light spanning several nanometers centered around the chosen wavelength."  Piston Decl. ¶¶ 74–77.  "For example," he continues, "selection of lines 534nm, 553nm, and 579nm . . . would result in continuums of white light in the approximate range of 533-535nm, 552-554nm and 578-560nm. These bandlets of white light come from the supercontinuum white light pulse comprising an entire spectrum of white light."  But Michigan's 'bandlet' argument stops short of explaining how, even if "[t]hese bandlets *of white light* come from the supercontinuum white light pulse comprising an entire spectrum of white light," the bandlets could be found to "compris[e] an entire spectrum of white light."  Piston Decl. ¶77. (emphasis in original).  There is no dispute, then, that even if Michigan's 'bandlet' framing is to be adopted, it still would not extend to the scope required by the claim language.

### b. Lambda and Lambda-Lambda Scans

Next, Michigan highlights that the Accused Products have settings (lambda and lambda-lambda modes) that allow the products to "use the full supercontinuum white light pulse from the white light laser" as a way to excite a sample.  MSJ Oppo. 16. (noting that the University is still

pursuing discovery on this feature). In describing the lambda scan modes, Dr. Piston points to an example in an Accused Product manual explaining that for a product to output at a broader wavelength range, the "lambda scans perform [hundreds of] excitation steps, which is using *every* wavelength from [the] full supercontinuum . . . to excite the sample." Piston Decl. ¶ 83. Therefore, Dr. Piston explains, "in the lambda scan mode, the Accused Products use the entire breadth of the [white light laser's] supercontinuum white light pulse to excite the sample." *Id.*

Leica does not contest Michigan's arguments concerning the lambda scans, but argues that these "excitation steps" are each "separate and discrete pulses, one for each excitation step, none of which 'comprise an entire spectrum of white light.'" MSJ Reply 6. During the hearing on this motion, counsel for Leica again clarified that using the lambda scan mode "is just the computer allow[ing] you to do consecutive scans, one, by one, by one." November 6 Hearing Transcript [Dkt. No. 184] at 14. These individual scans, similar to the bandlets, do not consist of the "entire spectrum of white light" as required by the '169 Patent.

Michigan responds that there is an expert "dispute over how the scans actually work" because in their view, Dr. Piston understands the Accused Products to use "the entire breadth of the white light laser supercontinuum white light pulse to excite the sample." *Id.* at 25–26. Dr. Piston does state that in his understanding, "a user of the Accused Products can configure a [lambda] scan to use the white light laser to irradiate a test sample with an entire spectrum of white light." Piston Decl. ¶ 89. But at no point do Dr. Piston or the University assert that the "excitation steps" that the Accused Products use in the lambda scan mode do *not* consist of individual, discreet, scans—necessarily incapable of hitting the sample with the full spectrum of white light simultaneously. Without this argument, there is no dispute as to how the Accused Products read on the '169 Patent.

I conclude that no reasonable jury could find that the Accused Products infringe on the '169 patent because there is no genuine dispute that the Accused Products do not reach the scope

1   of the "said supercontinuum" claim language.  Summary judgment for Leica is GRANTED on this

2   ground.  *See Novartis Corp.*, 271 F.3d at 1046.

3                                              **CONCLUSION**

4           Because I determine that Leica cannot infringe on the '169 Patent due to the "said

5   supercontinuum" claim language, I decline to address its arguments on the "single source" claim

6   language or Michigan's presented direct infringement issue concerning Leica's use of slides in the

7   Accused Products.  Leica's motion to dismiss for lack of standing is DENIED and its motion for

8   summary judgment is GRANTED.

9           **IT IS SO ORDERED.**

10  Dated: January 9, 2025

11

12  

13  _____
    William H. Orrick
    United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28